**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LORI HOCKENBERRY, | CASE NO. 4:15-cv-00793-MWB-GBC |
| Plaintiff, | (JUDGE BRANN) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL** |
| Defendant. | Docs. 1, 9, 10, 15, 20, 21 |

## REPORT AND RECOMMENDATION

### I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Lori Hockenberry ("Plaintiff") for disability insurance benefits under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.* (the "Regulations"). During the relevant period, Plaintiff worked slightly more than twenty-six hours per week at a Wendys. (Tr. 109-10). She claims she would be unable to work forty hours per week due to fatigue and pain. (Pl. Brief). No treating provider submitted a statement that meets the definition of "medical opinion" in 20 C.F.R. §404.1527(a). Doc. 10. All of the

statements that met the definition of "medical opinion" with regard to physical function are from non-treating providers and indicated that Plaintiff could perform the physical demands of work forty hours per week. Doc. 10.. There were conflicting medical opinions with regard to Plaintiff's mental function, but neither was from treating providers or entitled to any special deference. Doc. 10.

The Court reviews the ALJ's denial under the deferential substantial evidence standard, where the Court affirms if any reasonable person would have denied benefits. *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal citations omitted). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Here, Plaintiff fails to demonstrate that no reasonable person would deny her benefits. (Pl. Brief); (Pl. Reply). The ALJ reasonably concluded that Plaintiff could perform the physical demands of work forty hours per week. The Court would refuse to direct a verdict in Plaintiff's favor "if the trial were to a jury." *Id.* The Court recommends that Plaintiff's appeal be denied, the decision of the Commissioner be affirmed, and the case closed.

## II.    Procedural Background

On July 12, 2012, Plaintiff applied for DIB. (Tr. 197-98). On September 20, 2012, the Bureau of Disability Determination ("state agency") denied Plaintiff's

application (Tr. 137-54), and Plaintiff requested a hearing. (Tr. 155-56). On November 14, 2013, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 105-35). On November 26, 2013, the ALJ found that Plaintiff was not entitled to benefits. (Tr. 85-104). Plaintiff requested review with the Appeals Council (Tr. 83-84), which the Appeals Council denied on February 27, 2015, affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-7). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On April 22, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On June 29, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On September 29, 2015, Plaintiff filed a brief in support of the appeal ("Pl. Brief"). (Doc. 15). On December 1, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 20). On December 2, 2015, Plaintiff filed a brief in reply ("Pl. Reply"). (Doc. 21). On September 10, 2015, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.   Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant

satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Relevant Facts in the Record

### A.    Age, Vocation, Education

The administrative transcript is 646 pages. Doc. 10. Plaintiff was born on in 1963 and was classified by the Regulations as a younger individual, then a person closely approaching advanced age, through the date of the ALJ decision. (Tr. 97);

20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a sales attendant, cashier, and fast food worker. (Tr. 97, 132). She worked full-time at Sunoco as a shift leader from 2006 until June of 2012 (Tr. 110, 218-19). She applied at several businesses, took eight weeks of computer classes, and "took four tests for the state transportation," which she passed. (Tr. 125). She was on a list for state transportation jobs for a year. (Tr. 125). In November of 2012, about four months after losing her job at Sunoco, she began working twenty-six hours a week making sandwiches in the Wendy's drive-thru. (Tr. 109-10).

## B.    Testimony and Lay Reports

Plaintiff alleges onset of July 10, 2012. (Tr. 90). On November 14, 2013, she testified that, for the previous year, she had worked twenty-six hours per week making sandwiches in the Wendy's drive-thru. (Tr. 109-10). She testified that she was "not sure" if she could work at Wendy's forty hours a week because it "might" be "exhausting." (Tr. 126). She then testified that she could only walk for ten minutes at a time and only stand for two hours at a time before her legs get numb and she experiences back pain. (Tr. 112-13). She also testified that she worked three six-hour shifts a week, one five-hour shift a week, and one three-hour shift per week, with no ability to take breaks or sit down, and was on her feet for the entire six hour shift. (Tr. 118, 120). She testified that she took one extra unscheduled ten minute break per week. (Tr. 121-22). She testified that she did not

take days off from work due to her impairments. (Tr. 124). She testified that she took her children to activities four days a week, including Saturday. (Tr. 114). She testified that she could dress, shower, cook, shop, do dishes, do laundry, vacuum, sweep, take out the trash, and drive. (Tr. 110-11). She testified that she sleeps most of the day on Saturday and Sunday. (Tr. 119-20).

On July 19, 2012, Plaintiff completed a Function Report. (Tr. 254). She reported that she could not lift "over" ten pounds and could not stand for "long periods of time." (Tr. 254). She reported that her medications caused side effects of fatigue, personality changes, gastrointestinal problems, and "puffiness." (Tr. 254). She reported problems concentrating, completing tasks, and following instructions. (Tr. 252). She reported that walking makes her right knee go numb. (Tr. 252). She reported that she could perform personal care and chores with the help of her children. (Tr. 247-52). She reported that was "extremely tired" with "no energy." (Tr. 247). She reported occasional problems getting along with others. (Tr. 252). She reported fatigue everyday and "intense" low back pain. (Tr. 256). She reported that her pain only occurred for up to twenty minutes at night when she was going to bed, but it kept her up occasionally, even with medicine. (Tr. 256).

Plaintiff's "neighbor/friend" Teresa O'Conner also submitted a Function Report. (Tr. 258). She reported that Plaintiff "gets very tired" and "her feet swell." (Tr. 258). She responded "I don't know" to most questions. (Tr. 258-65). She

indicated that Plaintiff could only lift ten pounds and that when she stands for "hours," her feet swell. (Tr. 263). She reported that Plaintiff can pay attention for "as long as necessary," that paying attention was "not a problem," that she finishes what she starts, and follows instructions well. (Tr. 263). She reporting that Plaintiff did not have any problems with walking, concentration, or getting along with others. (Tr. 263). She reported that Plaintiff has "held down a full time job and done household/yard chores, while caring independently for both her children and herself." (Tr. 265).

In October of 2012, Plaintiff reported that:

> I get up every morning get the kids off to school, then I am so exhausted I go back to sleep until 1 p.m. or so. I get up, let dog out, eat lunch, shower, make dinner, and do wash. Then I get ready for kids to come home. After Dinner, we have activities for the kids everynight, for both. I drive them and either sit waiting in the car or the waiting room. I don't work anymore. So I am not standing, squatting, bending down, for more than 10 minutes at a time. I still need all my medications, which new ones soon to come, who knows what the side effects will be. It is hard to stand without leaning on something, when sitting for long periods, my legs go numb, at night before going to sleep, I am experiencing chest pains almost like indigestion, but really hurting and uncomfortable.

(Tr. 273).

## C.      Medical Records

Plaintiff underwent treatment in 2005 for kidney stones. (Tr. 286-324). She also had "very mild" Hepatitis C "consistent with stage 1 grade 1." (Tr. 312).

Plaintiff treated at Family Care Mechanicsburg in 2011. (Tr. 345). In February of 2011, she presented for hypertension and respiratory impairments and reported that he job was very stressful. (Tr. 345). Plaintiff was anxious and overweight but examination was otherwise normal. (Tr. 345-47). In March, April and August of 2011, Plaintiff presented to for ear pain and cough. (Tr. 333, 340 342). She denied dizziness, fatigue, and malaise. (Tr. 331, 342). Chronic problems included adjustment disorder, asthma, benign hypertension, Hepatitis C, and tobacco use. (Tr. 331, 342). Examinations were normal and providers assessed sinusitis and a respiratory infection, related in part to tobacco use. (Tr. 332, 340, 343).  At an annual examination in May of 2011, Plaintiff reported anxiety, asthma, and hypertension. (Tr. 334). This record does not mention pain. (Tr. 334). Plaintiff received medication for anxiety and hypertension. (Tr. 337).

Plaintiff alleges onset of June 20, 2012, but the transcript contains no contemporaneous treatment records. Doc. 10. The only treatment between August of 2011 and her alleged onset date was in May of 2012, when Plaintiff reported temporary pain and symptoms of a urinary tract infection. (Tr. 354, 380). When she presented for a surgical evaluation on May 10, 2012, "her symptoms [were] all gone." (Tr. 354). Examination indicated only abdominal tenderness. (Tr. 354). Providers noted Plaintiff had "some vague Gl symptoms, which today are resolved and had a CT scan 48 hours ago. This did not show  any evidence of pathology in

the abdomen, I suspect she may have suffered from gastroenteritis, and this is better now." (Tr. 354). Plaintiff did not have any subsequent treatment until after her alleged onset date. Doc. 10.

Plaintiff stopped working on June 20, 2012. Doc. 10. On July 10, 2012, she presented to CRNP Wesley Kiepea for a pap smear. (Tr. 376). She denied fatigue and malaise. (Tr. 376). Except for a benign breast mass, examination was normal, with no tenderness, "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (Tr. 377). Plaintiff presented to CRNP Wesley Kiepea for an annual exam the next day. (Tr. 369). Plaintiff was unemployed. (Tr. 370). She reported anxiety and PTSD that were controlled with Lorazepam. (Tr. 370). She denied fatigue, malaise, sleep disturbance, "back pain, joint pain, joint swelling, muscle weakness and neck pain." (Tr. 371). Examination indicated no tenderness, normal reflexes, and "normal range of motion, muscle strength, and stability in all extremities with no pain on inspection. Gait is normal." (Tr. 373). CRNP Wesley Kiepea ordered testing for Hepatitis C and the breast mass. (Tr. 374). The same day, she opined that Plaintiff would be disabled for a full year due to Hepatitis C and hypertension. (Tr. 368).

On August 7, 2012, Plaintiff underwent a gastroenterology examination for possible treatment of Hepatitis C with CRNP Matisse (Tr. 407). Plaintiff reported "fatigue, depression and abdominal pain…nausea, vomiting, diarrhea, difficulty

concentrating, irritability and weight gain" and denied "any symptoms of chronic liver disease… abdominal pain, jaundice, peripheral edema, abdominal swelling, mental changes, rashes or pruritus." (Tr. 407). Plaintiff was "unemployed, looking for work, recently separated from work 6/2012." (Tr. 408). Physical, mental, and musculoskeletal examinations were normal. (Tr. 410). Plaintiff was scheduled for additional testing. (Tr. 410). On September 13, 2012, CRNP Matisse stated that Plaintiff had "no limitation" in lifting, carrying, standing, walking, sitting, pushing, or pulling. (Tr. 399).

On September 3, 2012, Plaintiff underwent a consultative psychiatric examination with Dr. Christopher Royer, Psy.D. (Tr. 427). Plaintiff reported that she had "10-pound weight lifting limit because of having a history of four surgeries." (Tr. 427). She reported appetite changes, poor sleep, "that she stays awake and worries all night," and that she had been "let go" from Sunoco two months earlier. (Tr. 428). Mental status examination indicated no abnormalities except "some difficulty with abstract conceptualizations." (Tr. 429). Dr. Royer opined that Plaintiff had work-preclusive mental limitations, specifically marked limitations in making judgments on simple work-related decisions, interacting with supervisors and coworkers, and responding appropriately to changes in a routine setting. (Tr. 431).

On September 11, 2012, Plaintiff followed-up with CRNP Mattise and denied weight changes, fatigue, "[b]ackache, Decreased Range of Motion, Joint Pain, Joint Stiffness, Joint Swelling, Muscle Atrophy and Muscle Weakness…Anxiety, Depression, Mood changes and Trouble Falling Asleep." (Tr. 464). Physical examination was normal, with "normal gait and station," no spinal tenderness, "normal movements without pain and normal strength and tone," and normal extremities. (Tr. 465). Mental status examination indicated that Plaintiff was "happy" and "talkative" with no abnormalities noted. (Tr. 465).

On September 19, 2012, state agency physician Dr. Roger Fretz, Ph.D., reviewed Plaintiff's file and authored an opinion. (Tr. 142). He opined that Plaintiff had mild limitation in activities of daily living and concentration, persistence, and pace, and moderate limitation in maintaining social functioning. (Tr. 142).

Plaintiff's application was initially denied on September 20, 2012. (Tr. 137). On October 7, 2012, Plaintiff presented to Dr. William Nasuti, D.O., with complaints of persistent back pain that had been ongoing for "9 years." (Tr. 441). Plaintiff denied fatigue, weight gain, weight loss, "extremity weakness, gait disturbance and numbness in extremities." (Tr. 441). Examination of the spine and extremities was normal, with no tenderness, no edema, and normal reflexes. (Tr. 442). Mental status examination was normal. (Tr. 442). Dr. Nasuti ordered lumbar

spine X-rays, instructed Plaintiff to take Aleve, and indicated that neither an orthopedic consult nor an MRI were necessary. (Tr. 442).

On November 11, 2012, Dr. Nasuti and Dr. Uniacke opined to the Housing Authority of Columbia County that Plaintiff was "unable to engage in any substantial, gainful activity." (Tr. 529).

On November 15, 2012, Plaintiff presented to Dr. Uniacke with a cold. (Tr. 438). Plaintiff was assessed to have sinusitis. (Tr. 440).  Plaintiff needed to start an anti-depressant before treating with interferon for Hepatitis C as scheduled in January of 2013. (Tr. 440).

On November 23, 2012, Plaintiff followed-up with CRNP Matisse for Hepatitis C. (Tr. 478). CRNP Matisse noted "grade 1, stage 2" Hepatitis C. (Tr. 478). CRNP Matisse deferred Hepatitis C treatment based on a "history of" mental health impairments, alcoholism, and drug abuse, with a history of suicidal thoughts "over ten years ago," and recommended that Plaintiff "be evaluated for her depression and possibly get started on a maintenance dose of an antidepressant." (Tr. 478). CRNP noted that Plaintiff had a "low viral load" and should engage in a low-fat weight loss diet and exercise. (Tr. 478). Plaintiff denied weight changes, fatigue, "[b]ackache, Decreased Range of Motion, Joint Pain, Joint Stiffness, Joint Swelling, Muscle Atrophy and Muscle Weakness…Anxiety, Depression, Mood changes and Trouble Falling Asleep." (Tr. 482). Physical examination was normal,

with "normal gait and station," no spinal tenderness, "normal movements without pain and normal strength and tone," and normal extremities. (Tr. 482-83). Mental status examination indicated that Plaintiff was "happy" and "talkative" with no abnormalities noted. (Tr. 483). On January 8, 2013, Plaintiff returned to CRNP Matisse, and indicated that she had refused to start an anti-depressant because of its side effects. (Tr. 526). The record contains no evidence of treatment for the next five months. Doc. 10.

On December 12, 2012, state agency physician Dr. Mila Bacalla, M.D., reviewed Plaintiff's file and authored an opinion. (Tr. 513). Dr. Bacalla opined that Plaintiff could perform a range of light work, perform occasional postural movements, and avoid exposure to fumes and other respiratory hazards. (Tr. 510-11). Dr. Bacalla noted Plaintiff's diagnoses of morbid obesity, Hepatitis C, and status post hernia surgeries. (Tr. 508).  Dr. Bacalla explained that Plaintiff's back impairment was "not well-documented." (Tr. 512). Dr. Bacalla  also explained that Plaintiff's claim that she could walk for only five minutes and lift only ten pounds were "not well supported by the objective evidence." (Tr. 512).

On May 11, 2013, Plaintiff presented to Dr. Uniacke for an ear ache. (Tr. 540). Plaintiff reported "difficulty breathing when inhaling vapors from frying food at her job." (Tr. 536). Dr. Uniacke diagnosed an asthma exacerbation and prescribed prednisone and a nasal spray. (Tr. 539).

On July 2, 2013, Plaintiff presented to Dr. Fowler for a pap smear. (Tr. 544). She reported back pain and denied fatigue, malaise, weight change, joint pain, joint swelling, and muscle weakness. (Tr. 545). Physical examination was normal, with normal respiratory findings, normal mental status examination, and "[n]ormal range of motion, muscle strength, and stability in all extremities with no pain on inspection." (Tr. 547). Plaintiff was instructed to increase her activity as tolerated. (Tr. 548). On July 9, 2013, Plaintiff followed-up with a CRNP and reported dizziness, aching, swollen legs, and cramping feet. (Tr. 550). Examination was normal and Plaintiff was referred to an ENT. (Tr. 553). On July 23, 2013, Plaintiff followed-up with Dr. Fowler and reported urinary symptoms. (Tr. 557). Plaintiff reported fatigue and back pain. (Tr. 556). Examination was normal, with no swelling, normal sensation and mental status, and intact motor function and reflexes. (Tr. 558).

On July 26, 2013, CT scan of the abdomen and pelvis indicated "fatty replacement of the liver and pancreas," "with no evidence of urinary tract calcification or obstruction… no additional abnormality noted with regard to the urinary tract and there is no CT explanation, at this time, for hematuria," and "no evidence of obstruction of the GI tract….or other significant abnormality." (Tr. 618). In August of 2013, a benign cervical polyp was removed. (Tr. 612-14, 619-21).

On August 16, 2013, CRNP Matisse noted that Plaintiff had a "very low viral load," was "doing quite well," and "denied any symptoms of chronic liver disease." (Tr. 565). CRNP Matisse deferred Hepatitis C treatment. (Tr. 565). On September 5, 2013, Plaintiff followed-up with CRNP Matisse and reported fatigue and lower extremity swelling. (Tr. 566). She reported the swelling occurred "when she is on her feet all day at her job." (Tr. 566). Plaintiff's "liver disease ha[d] been stable and treatment [was] being postponed until the newer treatment is on the market with less side effects." (Tr. 566). CRNP Matisse observed scattered wheezes, "some erythematous areas and spider veins," and non-pitting edema. (Tr. 569). Musculoskeletal examination indicated "mild" tenderness and "mild" pain. (Tr. 569). CRNP Matisse instructed Plaintiff to treat her swelling with Tylenol. (Tr. 570).

On September 10, 2013, Plaintiff saw a specialist for ear, nose, and throat complaints. (Tr. 622). Plaintiff reported "benign positional vertigo symptoms that resolved spontaneously. They would only happen in bedtime and they have not occurred for quite a while." (Tr. 623). She was prescribed Flonase. (Tr. 623). Plaintiff "no showed" for her follow-up appointment scheduled the next month. (Tr. 628).

On September 20, 2013, Plaintiff followed-up with another provider at CRNP Matisse's office. (Tr. 571). Plaintiff reported intermittent rectal bleeding

and constant fatigue. (Tr. 571). Colonoscopy eleven months earlier had indicated diverticulosis and hemorrhoids. (Tr. 571). Examination was normal, with no swelling, normal sensation, no spinal tenderness, "normal gait and station….normal movements without pain and normal strength and tone." (Tr. 574). Plaintiff was instructed to take vitamins for fatigue and was prescribed Anusol for the rectal bleeding. (Tr. 575).

On October 2, 2013, Dr. Fowler authored a letter where she opined that Plaintiff was "working well beyond her physical capacity to provide for her family," which was "taking a great toll on her physical condition," and she "recommend[ed] that [Plaintiff] receive as much support as possible to help her provide for her family." (Tr. 605). She identified Plaintiff's diagnoses of Hepatitis C, asthma, chronic abdominal pain and previous abdominal hernia repair with mesh, a mood disorder, diverticulosis, and diverticulitis. (Tr. 605). The same day, treatment records indicate that Plaintiff was complaining of fatigue and increased abdominal pain. (Tr. 606). On October 15, 2013, Dr. Fowler noted improved diverticulitis and instructed Plaintiff to increase her activity level and water intake. (Tr. 610).

### D.    Sentence Six

Plaintiff submitted additional records that were not before the ALJ. (Tr. 633-46). They were not material because they do not support Plaintiff's claims. On

August 6, 2013, CRNP Mattise noted that Plaintiff denied fatigue, tiredness, weight changes, difficulty breathing, decreased range of motion, weakness, and trouble sleeping, and normal respiratory examination, normal mental status, and normal musculoskeletal function except for "mild" pain and "mild" tenderness. (Tr. 637). On October 15, 2013, Dr. Fowler noted that Plaintiff denied fatigue, problems breathing (dyspnea), anxiety, depression, psychiatric symptoms, gait disturbance, "bone/joint symptoms, joint swelling, leg pain, muscle weakness and weakness." (Tr. 642). Examination showed normal respiration, abdominal tenderness, intact motor function and reflexes, normal sensation, and normal mental status. (Tr. 644). On January 1, 2014, Dr. Fowler assessed Plaintiff's hypertension as stable. (Tr. 646). These records also contain an opinion from Dr. Uniacke that Plaintiff's limitations were not present until "Winter 2014." (Tr. 5-6, 8-82, 633-46).

### V.      Plaintiff Allegations of Error

### A.      Medical Opinions

Plaintiff asserts that the ALJ erred in assigning weight to the medical opinions. (Pl. Brief). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental

restrictions." 20 C.F.R. § 404.1527(a)(2).   Medical opinions can come from various sources, including treating physicians, examining physicians, and non-examining physicians. 20 C.F.R. §§ 404.1527(c)(1)-(2). Statements on issues reserved to the Commissioner and statements from sources who are not acceptable medical sources are excluded from the definition of "medical opinion." *See* 20 C.F.R. §§ 404.1527(a)(2); 404.1527(d).

The Regulations provide special deference to medical opinions from treating sources who have "seen [the claimant] a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment" ("treating source rule"). *See* 20 C.F.R. § 404.1527(c)(2). If a medical opinion subject to the treating source rule ("treating source medical opinion") is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the ALJ must "give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If a statement or medical opinion is not subject to the treating source rule, the ALJ does not need to afford the statement or medical opinion any special deference or meet the "good reasons" requirement of 20 C.F.R. §404.1527(c)(2). When evidence is not entitled to special deference, the Court reviews the ALJ's resolution of an evidentiary conflict using the substantial evidence standard of review.  *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). As long as the ALJ

"explain[s] in the decision the weight given" and a reasonable person would find the evidence adequate to discount the opinion, the Court will uphold the ALJ's assignment of weight to a non-treating source opinion. *See* 20 C.F.R. §404.1527(e)(ii); *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation omitted).

When the ALJ does not assign controlling weight to a treating source opinion, ALJ applies the factors in 20 C.F.R. §404.1527(c). Section 404.1527(c)(1) provides that, "[g]enerally, [the Commissioner] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(3), "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion" and "[t]he better an explanation a source provides for an opinion, the more weight we will give that opinion." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(4), "the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." *Id.* Pursuant to 20 C.F.R. §404.1527(c)(5), more weight may be assigned to specialists, and 20 C.F.R. §404.1527(c)(6) allows consideration of other factors which "tend to support or contradict the opinion." *Id.*

SSR 95-6p provides:

[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special

significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

*Id.*

Plaintiff asserts that the ALJ violated the "treating physician rule" contained in 20 C.F.R. §404.1527 with regard to statements by Dr. Fowler, Dr. Nasuti, Dr. Uniacke, and nurse practitioner Wesley-Kiepea. (Pl. Brief at 17-18). Plaintiff notes that nurse practitioner Wesley-Kiepea opined that she was "totally disabled," Dr. Nasuti and Dr. Uniacke opined that she was "disabled from substantial gainful activity," and Dr. Fowler opined that Plaintiff was "working at or beyond her physical capacity," and "could not work more than the 20-25 hours a week she was working at that time." (Pl. Brief at 17-18) (citing Tr. 368, 529, 605-06).  However, all of these statements are either on issues reserved to the Commissioner, statements from sources who are not acceptable medical sources, or both. *See* 20 C.F.R. §§ 404.1527(a)(2); 404.1527(d). None of these meet the definition of "medical opinion." *Id.* The treating source rule applies only to statements that meet the definition of medical opinion. *See* 20 C.F.R. §404.1527(c)(2); SSR 96-5p (Statements on issues reserved to the Commissioner are "never entitled to…special significance"); SSR 06-3p ("only 'acceptable medical sources' can be considered

treating sources"). Thus, the treating source rule does not apply to any of these statements.

In some cases, it may be error for an ALJ to reject a medical opinion simply because it is on an issue reserved to the Commissioner without recontacting the physician. However, when the matter is before a District Court, the ALJ's duty to develop the record coexists with a claimant's duty to present all relevant evidence to the ALJ, and establish good cause for omitted evidence. *See Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). The Court in *Matthews* explained:

> It might seem ... that the district judge and we would be free to consider the new evidence that was before the Appeals Council in deciding whether the decision denying benefits was supported by the record as a whole. And of course this is right when the Council has accepted the case for review and made a decision on the merits, based on all the evidence before it, which then becomes the decision reviewed in the courts. It is wrong when the Council has refused to review the case. For then the decision reviewed in the courts is the decision of the administrative law judge. The correctness of that decision depends on the evidence that was before him. He cannot be faulted for having failed to weigh evidence never presented to him....

*Id.* (quoting *Eads v. Sec'y of Dep't of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993)). The Court continued:

> Our holding is also in accord with sound public policy. We should encourage disability claimants to present to the ALJ all relevant evidence concerning the claimant's impairments. If we were to order remand for each item of new and material evidence, we would open the door for claimants to withhold evidence from the ALJ in order to preserve a reason for remand. *See Szubak*, 745 F.2d at 834 ("A claimant might be tempted to withhold medical reports, or refrain from introducing all relevant evidence, with the idea of obtaining

> another bite of the apple if the Secretary decides that the claimant is
> not disabled.") (quotation omitted); *Wilkins,* 953 F.2d at 97
> (Chapman, J., dissenting) ("By allowing the proceedings to be
> reopened and remanded for additional evidence, ... the majority is
> encouraging attorneys to hold back evidence and then seek remand for
> consideration of evidence that was available at the time of the ALJ
> hearing."). Instead, we believe that it is a much sounder policy to
> require claimants to present all material evidence to the ALJ and
> prohibit judicial review of new evidence unless there is good reason
> for not having brought it before the ALJ. Such a holding is
> instrumental to the speedy and orderly disposition of Social Security
> claims.

*Matthews v. Apfel*, 239 F.3d 589, 595 (3d Cir. 2001). In *Matthews*, the Court held

that the claimant "should have known" the additional evidence, a vocational

evaluation, was necessary. *Id.* Consequently, the claimant failed to establish good

cause. In *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 360 (3d Cir. 2011), the

Court held that a claimant failed to establish good cause for failing to submit

medical opinions. *Id.* When a statement from a treating source is on an issue

reserved to the Commissioner, Plaintiff should have known that a more detailed

opinion would be necessary because the Regulations plainly state that statements

on issues reserved to the Commissioner are not medical opinions or entitled to any

special deference. *See* 20 C.F.R. §404.527; SSR 96-5p. Plaintiff has not established

good cause for failing to provide any treating source medical opinions.

Aside from arguing that the ALJ's evaluation violated the treating source

rule, Plaintiff cites only medical records that indicate "fatigue and need for

antidepressants in November of 2012," her report of "worsening back pain," and

her diagnoses of hypertension, Hepatitis C, asthma, abdominal pain, hernia repair, mood disorder, diverticulosis and diverticulitis. (Pl. Brief at 17-18) (citing Tr. 368, 438, 441, 605-06). Plaintiff focuses her argument on Dr. Fowler, arguing that "[t]he only evidence inconsistent with the opinion of Dr. Fowler is from the non-examining state agency medical doctor." (Pl. Brief at 19) (citing Tr. 509-11). However, as discussed above, Dr. Fowler's statement was not a medical opinion. *See* 20 C.F.R. §404.527; SSR 96-5p. Moreover, Dr. Fowler's statement was also contradicted by CRNP Matisse, who indicated that Plaintiff had no limitation in lifting, carrying, standing, walking, sitting, pushing, and pulling. (Tr. 399, 407, 410). Dr. Fowler's opinion is also contradicted by Plaintiff's claims to her other treating providers, to whom she denied fatigue and pain. (Tr. 370-71, 376-77, 464, 482, 637, 642). Finally, Dr. Fowler's opinion is contradicted by the opinion submitted after the ALJ decision, which indicates that Plaintiff's limitations were not present until "Winter 2014," which was after the 2013 ALJ decision. (Tr. 14). With regard to diagnoses, diagnoses fail to establish disability under the Act. *See Jones v. Sullivan*, 954 F.2d 125, 128 (3d Cir. 1991) (There is no "presumption that a mere diagnosis...renders an applicant eligible for benefits under the Social Security Act").

With regard to CRNP Wesley Kiepea, the same day CRNP Wesley Kiepea opined that Plaintiff would be disabled for a full year due to Hepatitis C and

hypertension, CRNP Wesley Kiepea noted Plaintiff reported anxiety and PTSD that were controlled with Lorazepam and denied fatigue, malaise, sleep disturbance, "back pain, joint pain, joint swelling, muscle weakness and neck pain." (Tr. 370-71). Examination indicated no tenderness, normal reflexes, and "normal range of motion, muscle strength, and stability in all extremities with no pain on inspection. Gait is normal." (Tr. 373). CRNP Wesley Kiepea ordered testing for Hepatitis C and the breast mass. (Tr. 374). In other words, CRNP Wesley Kiepea opined that Plaintiff's Hepatitis C was disabling, and would be disabling for a full year, before she even got Plaintiff's viral load test back. (Tr. 368, 374). CRNP Wesley Kiepea opined that Plaintiff's hypertension was disabling, and would be disabling for a full year, without noting any symptoms related to hypertension. (Tr. 368, 370-71).

Plaintiff relies on evidence that was not before the ALJ. (Pl. Brief at 18) (citing Tr. 21, 25, 646). However, evidence that was not before the ALJ may not be considered by a reviewing court unless is it is new, material, and omitted for good cause. *See Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). On August 6, 2013, CRNP Mattise noted that Plaintiff denied fatigue, tiredness, weight changes, difficulty breathing, decreased range of motion, weakness, and trouble sleeping, and normal respiratory examination, normal mental status, and normal musculoskeletal function except for "mild" pain and "mild" tenderness. (Tr. 637).

On October 15, 2013, Dr. Fowler noted that Plaintiff denied fatigue, problems breathing (dyspnea), anxiety, depression, psychiatric symptoms, gait disturbance, "bone/joint symptoms, joint swelling, leg pain, muscle weakness and weakness." (Tr. 642). Examination showed normal respiration, abdominal tenderness, intact motor function and reflexes, normal sensation, and normal mental status. (Tr. 644). On January 1, 2014, Dr. Fowler assessed Plaintiff's hypertension as stable. (Tr. 646). Here, Plaintiff makes no argument that the evidence was new, material, or omitted for good cause. (Pl. Brief); (Pl. Reply); Local Rule 84.40.4(b) ("The court will consider only those errors specifically identified in the briefs."). Even if Plaintiff had made this argument the Court would conclude that it was either not omitted for good cause, not material, or both. *See Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). The Court does not recommend remand on these grounds.

## B.    Credibility

Plaintiff asserts that the ALJ erred in assessing her credibility and Teresa O'Connor's credibility. (Pl. Brief at 19-22). Plaintiff also asserts that the ALJ should have incorporated her subjective complaints of fatigue into the RFC. (Pl. Brief at 16-17). When making a credibility finding, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)…that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7P. Then:

> [T]he adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7P. In assessing credibility, the Regulations instruct the ALJ to consider factors enumerated in 20 C.F.R. §404.1529.  The ALJ is first instructed to consider "objective medical evidence," which "is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2). The ALJ is then instructed to consider "other evidence." 20 C.F.R. § 404.1529(c)(3). Other evidence includes Plaintiff's course of treatment, her daily activities, and the overall consistency of her claims. *Id.*; SSR 96-7p.

Here, the ALJ found that Plaintiff and Teresa O'Conner were less than fully credible based on: (1) objective medical evidence, including nurse practitioner Mattise's statement, Dr. Bacalla's opinion, and normal examination findings; (2) conservative treatment for Hepatitis C, gastrointestinal impairments, and asthma; (3)  inconsistencies in Plaintiff's claims; and (4) Plaintiff's activities of daily living. (Tr. 94-97). Plaintiff summarizes Plaintiff's testimony and Teresa O'Connor's Function Report (Pl. Brief at 19-20) and summarizes the applicable

law regarding credibility. (Pl. Brief at 20-21). Otherwise, Plaintiff's only specific argument regarding credibility is that her liver biopsy showing Hepatitis C and Dr. Fowler's opinion regarding fatigue caused by Hepatitis C supported her claims of debilitating fatigue, and "the only significant evidence inconsistent with the Plaintiff's allegations of debilitating fatigue is from the non-examining state agency medical doctor who felt the Plaintiff could still sit, stand and walk six hours at of an eight hour workday." (Pl. Brief at 22) (citing Tr. 478, 605). Plaintiff asserts that, as a result, the ALJ "provided little, if any, rationale for rejecting the testimony of the Plaintiff and the statements of her witness, Teresa O'Connor." (Pl. Brief at 22).[1]

Plaintiff does not address three out of four of the ALJ's reasons for finding her less than fully credible whatsoever, specifically that her claims and Teresa O'Connor's claims were contradicted by her conservative treatment, inconsistencies in her claims, or Plaintiff's activities of daily living. (Pl. Brief at 19-22); (Pl. Reply). With regard to the objective medical evidence, Plaintiff only addresses Dr. Bacalla's opinion. (Pl. Brief at 19-22). The ALJ may rely on medical

---

[1]Again, Plaintiff cites some evidence that was not present before the ALJ, specifically Plaintiff's explanation that she was only able to do household chores and drive "when she felt mentally and physically able to." (Pl. Brief at 20) (citing Tr. 20). However, evidence that was not before the ALJ may not be considered by a reviewing court unless is it is new, material, and omitted for good cause. *See Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). Here, Plaintiff makes no argument that the evidence was new, material, or omitted for good cause. (Pl. Brief); (Pl. Reply). Even if Plaintiff had made this argument the Court would conclude that it was not omitted for good cause.

opinions to interpret the objective evidence in assessing Plaintiff's credibility. *See Seever v. Barnhart*, 188 F. App'x 747, 754 (10th Cir. 2006) (citing *Winfrey v. Chater,* 92 F.3d 1017, 1022 (10th Cir.1996)) (We will not fault the ALJ for failing to interpret [Plaintiff's] symptoms and test results differently than [a medical expert]").

The ALJ properly relied on inconsistent claims. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p. Plaintiff testified that she could only walk for ten minutes at a time and only stand for two hours at a time before her legs get numb and she experiences back pain. (Tr. 112-13). She also testified that she worked three six-hour shifts a week, one five-hour shift a week, and one three-hour shift per week, with no ability to take breaks or sit down, and was on her feet for the entire six hour shift. (Tr. 118, 120). She testified that she took one extra unscheduled ten minute break per week. (Tr. 121-22). The medical records also document inconsistent claims. Plaintiff alleges onset on June 20, 2012, when she lost her job at Sunoco, but there are no contemporaneous treatment records. Doc. 10. In July of 2012, she denied fatigue and pain. (Tr. 370-71, 376-77). She reported fatigue and pain to CRNP Mattise in August of 2012, but CRNP Mattise's examination was normal and CRNP Mattise opined that Plaintiff had no limitation in lifting, carrying, standing, walking, sitting, pushing, or pulling. (Tr.

399, 407, 410). Plaintiff subsequently denied fatigue and pain to CRNP Matisse in September of 2012. (Tr. 464). Plaintiff's application for benefits under the Act was denied, and she then reported to Dr. Nasuti that she had been experiencing "persistent" back pain for "nine years." (Tr. 137, 441). The next month, she denied fatigue and back pain. (Tr. 482). She reported fatigue and pain to Dr. Fowler in July of 2013, but subsequently denied fatigue and pain. (Tr. 556, 637, 642). The ALJ also properly relied on Plaintiff's conservative treatment. "[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7P.

To the extent Plaintiff asserts that the ALJ did not "consider" various credibility factors, "there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision." SSR 06-3p; *see also Phillips v. Barnhart*, 91 Fed.Appx. 775, 780 (3d Cir. 2004) ("the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it") (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir.1998)); *Francis v. Comm'r Soc. Sec. Admin.*, 414 Fed.Appx. 802, 804-05 (6th Cir. 2011) ("Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include "good reasons ... for the

weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis…Procedurally, the regulations require no more.") (internal citations omitted).

If explanation allows meaningful judicial review, it suffices. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned"); *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis" and instead must only "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."); *Hur v. Comm'r Soc Sec.*, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in its  opinion every tidbit of evidence included in the record").

"Neither the district court nor the Court of Appeals is empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing *Early v. Heckler*, 743 F.2d 1002, 1007 (3d Cir.1984)); *see also Chandler v. Comm'r of Soc. Sec.*,  667 F.3d 356, 359 (3d Cir.2011) ("Courts are not permitted to re-weigh  the evidence or impose their own factual determinations") (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The ALJ is entitled to deference with regard to credibility

determinations. *See Szallar v. Comm'r Soc. Sec.*, No. 15-1776, 2015 WL 7445399, at *1 (3d Cir. Nov. 24, 2015) ("the ALJ's assessment of his credibility is entitled to our substantial deference") (citing *Zirnsak v. Colvin*, 777 F.3d 607, 612–13 (3d Cir.2014)). Plaintiff must demonstrate that no reasonable mind would accept the evidence cited by the ALJ to conclude that she was not fully credible. *See Richardson v. Perales*, 402 U.S. at 401 (1971). Plaintiff fails to do so, and the Court does not recommend remand on these grounds.

### C.     Mental Impairments

Plaintiff asserts that the ALJ erred in finding her mood disorder to be non-severe. (Pl. Reply). Plaintiff asserts that this error was harmful because the ALJ failed to include marked limitations in the hypothetical to the VE. (Pl. Brief at 13-17). Plaintiff relies on Dr. Royer's opinion and Dr. Fretz's opinion, but they were not treating sources so their opinions were not entitled to any special deference. (Pl. Brief at 13-16). The prohibition on lay reinterpretation of evidence no longer applies to non-treating sources. Plaintiff cites a variety of Third Circuit cases from prior to the 1991 enactment of 20 C.F.R. 404.1527(c)(2). (Pl. Brief at 17-19). Section 404.1527 retained these cases with regard to well-supported medical opinions from treating sources that are not inconsistent with other substantial evidence. *See Tilton v. Colvin*, No. 1:14-CV-02219-YK-GBC, 2016 WL 1580003, at *5 (M.D. Pa. Mar. 31, 2016), *report and recommendation adopted,* No. 1:14-

CV-2219, 2016 WL 1569895 (M.D. Pa. Apr. 19, 2016) (citing *Burns v. Colvin,* No. 1:14–CV–1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (citing *United States v. Texas,* 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993); *Sebelius v. Cloer,* ___ U.S. ____, 133 S.Ct. 1886, 1896, 185 L.Ed.2d 1003 (2013); *Connecticut Nat. Bank v. Germain,* 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 543, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994)).

However, Section 404.1527 abrogated these cases with regard to non-treating sources. When regulatory language "speak[s] directly" to an issue, and is not "compatible with preexisting practice," the regulation abrogates common-law. *Sebelius v. Cloer,* ––– U.S. –––, 133 S.Ct. 1886, 1896, 185 L.Ed.2d 1003 (2013) (internal citations omitted); *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 543, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (internal citations omitted). The Regulations provide that ALJs are "not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i). The prior cases held that the ALJ was bound by any uncontradicted medical opinions, even from non-treating sources. *See Frankenfield v. Bowen,* 861 F.2d 405, 408 (3d Cir. 1988); *Doak v. Heckler,* 790 F.2d 26, 29–30 (3d Cir. 1986); *Ferguson v. Schweiker,* 765 F.2d 31, 37, 36–37 (3d Cir. 1985); *Kent v. Schweiker,* 710 F.2d 110, 115 (3d Cir. 1983); *Van Horn v. Schweiker,* 717

F.2d 871, 874 (3d Cir. 1983); *Kelly v. R.R. Ret. Bd.,* 625 F.2d 486, 494 (3d Cir. 1980); *Rossi v. Califano,* 602 F.2d 55, 58–59, (3d Cir. 1979); *Fowler v. Califano,* 596 F.2d 600, 603 (3d Cir. 1979); *Gober v. Matthews,* 574 F.2d 772, 777 (3d Cir. 1978). Consequently, 20 C.F.R. §404.1527(e)(2)(i) speaks directly to this issue, is incompatible with the prior law, and abrogates the prior cases with regard to non-treating opinions. An ALJ is no longer prohibited from reinterpreting medical evidence to supplant the opinion of a non-treating source. *See* 20 C.F.R. §404.1527(e)(2)(i).

Consequently, the ALJ must simply apply the factors in 20 C.F.R. §404.1527(c)(1)-(6) to assess the opinions. *Id.* Plaintiff cites her subjective claims and Teresa O'Connor's subjective claims, but the ALJ properly found those claims were not fully credible. *Supra.* Moreover, as Plaintiff notes, "[t]he only evidence in the record addressing mental impairments [are] the aforementioned opinion[s]." (Pl. Brief at 14). In other words, Plaintiff cites no medical evidence of mental impairments. (Pl. Brief). Consequently, Plaintiff fails to demonstrate that regulatory factors, such as the consistency of the opinions with other evidence, or the extent of support for the opinions, suggests that they should be credited. *See* 20 C.F.R. §404.1527(c)(3)-(4). The record supports the ALJ's assessment. Providers noted a "history of" mental impairments, but mental status examinations, including Dr. Royer's, were consistently normal. (Tr. 410, 429, 442, 465, 478, 547, 558).

Plaintiff reported depression once, in August of 2012, but by September of 2012 she was denying anxiety, depression, mood changes, and trouble sleeping. (Tr. 407, 464, 482). Plaintiff was "happy" and "talkative." (Tr. 465, 483). She refused to take anti-depressants. (Tr. 526).  The Court does not recommend remand on these grounds.

## VI.   Conclusion

The Court finds that the ALJ made the required specific findings of fact in determining whether Plaintiff met the criteria for disability, and the findings were supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Brown*, 845 F.2d at 1213; *Johnson*, 529 F.3d at 200; *Pierce*, 487 U.S. at 552; *Hartranft*, 181 F.3d at 360; *Plummer*, 186 F.3d at 427; *Jones*, 364 F.3d at 503. Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). "Stated differently, this standard is met if there is sufficient evidence 'to justify, if the trial were to a jury, a refusal to direct a verdict.'" *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). Here, a reasonable mind might accept the relevant evidence as adequate.

The Court would not direct a verdict in Plaintiff's favor if the issues were before a jury.  Accordingly, it is HEREBY RECOMMENDED:

I.      This appeal be DENIED, as the ALJ's decision is supported by

        substantial evidence; and

II.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: September 12, 2016                      _____s/Gerald B. Cohn_____
                                               GERALD B. COHN
                                               UNITED STATES MAGISTRATE JUDGE